Kim Long KO, Appellant,

v.

UNITED STATES, Appellee.

No. 93–CF–1322.

District of Columbia Court of Appeals.

Reargued En Banc Feb. 10, 1998.
Decided Dec. 30, 1998.

Roy W. Krieger, appointed by the court, for appellant.

Elizabeth Trosman, Assistant United States Attorney, with whom Mary Lou Leary, United States Attorney at the time the supplemental brief was filed, and John R. Fisher, Assistant United States Attorney, were on the brief, for appellee.

Before WAGNER, Chief Judge, TERRY, STEADMAN, SCHWELB, FARRELL, RUIZ and REID, Associate Judges, and MACK and KING,* Senior Judges.

PER CURIAM.

This matter was decided initially in a panel decision issued on May 8, 1997, *Kim Long Ko v. United States,* 694 A.2d 73 (D.C.1997). We vacated that decision on November 13, 1997, in response to the government's petition questioning part of the majority opinion regarding payment of the government's interpreters. We now reaffirm the judgment of the trial court for the reasons set forth below.

Kim Long (Peter) Ko was convicted by a jury of extortion, in violation of D.C.Code § 22–3851 (1996); threats, in violation of § 22–2307; and unlawful possession of ammunition, in violation of § 6–2361 (1995). Ko was acquitted of a number of other charges, including kidnapping while armed, two counts of assault with a deadly weapon, possession of a firearm during a crime of vio-

lence, and conspiracy. Ko's codefendants, Sun Kin (Sonny) Chan and Wai Kin (Simon) Chow, were found not guilty of all charges.

At the trial, which lasted over three weeks, fourteen different witnesses who used the Cantonese, Mandarin or Fukinese dialects testified through interpreters. Ko's principal contention on appeal is that the interpreters were not properly qualified and that some of them lacked the requisite impartiality. He points out, in particular, that several interpreters were paid by the United States Attorney's office, which was prosecuting the case against him. He claims that the asserted irregularities with respect to the use of interpreters deprived him of rights protected by the District's Interpreters for Hearing–Impaired and Non–English Speaking Persons Act of 1987 (the "Interpreter Act"), D.C.Code § 31–2701 *et seq.* (1993), and by the Constitution of the United States.

## FACTUAL SUMMARY

In February 1992, Ko purchased the Szechuan Restaurant, a well-known Chinatown eatery, from its previous owner, Tony Cheng. Later during that year, Ko accused several employees, including in particular a waiter named Sau Wong Lam, of stealing money from him. Lam and the others vigorously denied these allegations.

According to the prosecution, Ko and persons associated with Ko contrived to force Lam to confess that he was responsible for the theft and to implicate Lam's confederates. Lam was threatened, kicked, beaten, and burned with a hot chafing dish. Lam ultimately signed a written confession, and he admitted to the theft on videotape. Lam also signed a promissory note in which he agreed to pay Ko $20,000. The charges against Ko and his codefendants arose out of their alleged involvement in the mistreatment and coercion of Lam.

The trial judge faced the challenging task of ensuring that persons whose first language is a Chinese dialect—*e.g.*, Cantonese,

---

* Judge King was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on November 23, 1998.

Mandarin or Fukinese—could understand and be understood during a three week trial on an eleven count indictment relating to seven different serious offenses. At a pretrial status conference on January 26, 1993, the trial judge inquired as to the need for interpreters. It became clear that more than one interpreter would be needed, at least for the Cantonese and Mandarin dialects. The government informed the trial judge that it had obtained an interpreter for its witnesses, but that one interpreter would be inadequate given the number of witnesses and defendants. The trial judge announced his intention to contact the Office of Court Interpreting Services ("Interpreter's Office"), located in the Superior Court, to seek additional interpreters.[1]

On April 19, 1993, two interpreters engaged by the Interpreter's Office were present: Mr. Michael Yan who was certified in Mandarin but not Cantonese, and Mr. William Chan who was certified in Mandarin and Cantonese. The government told the court that the interpreter for its witnesses would be Dr. Tzeng. At the time, Dr. Tzeng had not yet arrived but reportedly was certified in Mandarin and Fukinese; the government was not sure if he spoke Cantonese. When he arrived; Dr. Tzeng indicated he spoke Fukinese and Mandarin. He pointed out that Mr. Chan was the Cantonese specialist.[2]

Of the three defendants, only Ko and Chan spoke both Mandarin and Cantonese; Mr. Chow only spoke Cantonese. Ko and Chow had some knowledge of English. At the commencement of the trial, only one interpreter was certified in Cantonese. Despite his non-certification in Cantonese, the trial judge asked Mr. Yan whether he was "pretty comfortable in Cantonese?" Mr. Yan responded, "well, depending on the subject matter, your Honor." When the judge stated: "Well, there's no biology lessons here" and "[t]his will be pretty rudimentary stuff, I think," Mr. Yan said: "Then I can give it a try."

Because the Interpreter's Office prohibits an interpreter from translating for more than thirty to forty-five minutes without a break, the trial court discussed a rotation system which would include Dr. Tzeng, the government's interpreter. On April 20, 1993, four interpreters were available: Dr. Tzeng and Mr. Frank S. Lee, the government's interpreters; Mr. Yan and Mr. Chan. The transcript is silent as to Mr. Lee's certification. The trial judge advised the four interpreters to confer during the lunch hour to "devise mutually agreeable arrangements" for interpretation, and that "interpreting should be done in that witness' own dialect, whatever it may be."

The first confusion about interpretation arose on April 21, 1993, during the testimony of government witness Tony Cheng. When the judge inquired as to Mr. Cheng's dialect, he was told "Cantonese, I believe." The court then turned to Dr. Tzeng and Mr. Lee for interpreting services, even though neither had been certified in Cantonese.[3] As the discussion continued, the judge mistakenly concluded that Mr. Chan, Mr. Yan and Dr. Tzeng were all certified in Cantonese; but only Mr. Chan was certified in Cantonese. Dr. Tzeng had made it clear he spoke only "a little" Cantonese. Later, despite the fact that Dr. Tzeng's certifications had never been placed on the record and he was not engaged by the Interpreter's Office, the judge informed government witness Sau Wong Lam that "Dr. Tzeng is a court certified interpreter."

At the start of the proceedings on April 22, 1993, an interpreter was missing. The trial judge turned to Mr. Lee, the government's interpreter, and asked if he "would ... provide us a little Mandarin interpreting for the defendants until we get somebody else." As the trial proceeded, the codefendants began to raise questions about the accuracy of Mr. Lee's translation.[4] In addition, the impar-

---

1. The Interpreter's Office generally relies on the United States State Department for interpreters.

2. Mr. Chan's name sometimes appears in the record as "Mr. Chang."

3. Mr. Cheng preferred to speak in Mandarin.

4. Concern and disagreement surfaced over Mr. Lee's translation of the word "karaoke" (spelled in the transcript as "karyoki") as "music room," and the translation of a witness' reference to six days as seven days.

tiality of the interpreter came under attack when an exchange occurred between the interpreter and an F.B.I. agent during the middle of defense cross-examination of a government witness. Issues of bias also were raised when Ko advised his counsel that two of the interpreters were "known friends" of a government witness, Tony Cheng. The court conducted a *voir dire* of the interpreters and concluded the accusations of known friendship were not true and "mostly nonsense."[5] Nonetheless, the court instructed the interpreters, especially Dr. Tzeng and Mr. Lee, the government's interpreters, not to talk with persons connected with the case, including the F.B.I., District police officers, and the attorneys. In response to the court's instruction, the government advised that it would be difficult for Dr. Tzeng and Mr. Lee to comply with the court's instructions because, in order to receive their pay, they were required to report to the Victim–Witness Assistance Unit in the United States Attorney's office so that their contract hours could be verified.

The trial court decided to introduce and adhere to a rotational procedure under which the interpreters would rotate and be required to interpret for witnesses and codefendants.[6] Codefendant Chan argued that all of the interpreters should be dismissed. The judge refused to dismiss the interpret-

ers, citing the difficulty of obtaining interpreters.[7] He also concluded that none of the interpreters "has misperformed in any way." As for the exchange between the F.B.I. agent and the interpreter, the judge assured the codefendants that the jury had not been affected by the exchange because the jury did not observe it. However, in addition to introducing a rotational system, the judge emphasized what he called "the rule of celibacy"—that interpreters should not "talk to anyone connected with this case."[8]

During the April 23, 1993 session, Julia Su, who was court certified in Mandarin, replaced Mr. Yan as interpreter. The court instructed Ms. Su to translate for a witness, and said "either Mr. Lee or Dr. Tzeng [the government's interpreters], whichever it is, can sit with the defendants."[9] A few issues concerning the accuracy of the interpretation were raised during the course of the proceedings.[10]

At the April 28, 1993 proceedings, certification and competency issues were discussed. Government counsel expressed concern about the English of the only Cantonese interpreter present at the time.[11] When government witness Jin Ying Mei needed a Cantonese interpreter, the court inquired as to the certification of each interpreter present. Mr.

---

5. Each of the interpreters indicated that there was no professional or social contact with Tony Cheng. Dr. Tzeng had eaten at Tony Cheng's restaurant years ago. Mr. Lee became upset at the accusations of bias by codefendant Ko and emphasized that he had learned only recently that Tony Cheng owned two restaurants.

6. The judge thought he had arranged to have the government's interpreters subcontracted to the court through the Interpreter's Office. He explained that he would "double check" with the Interpreter's Office. Further, he stated:

I don't particularly like the notion of house interpreters. And I think it's best probably for all concerned—and particularly for the jury's perception of all of this, that these are all four equal court interpreters who can perform the function in either respect, either interpreting witnesses or interpreting for the defendants and that there's not any favoritism being shown here between certain interpreters working on one team.

7. In explaining his difficulty in getting translators for the trial, the judge stated: "[G]etting

interpreters is not quite like sharpening a pencil."

8. As the judge put it: "I don't think ... having somebody sign a voucher is the problem. It's ... chatting with F.B.I. agents and others concerned with the case. And I think the safest course here is the rule of celibacy."

9. Mr. Lee offered to begin the translation to give Ms. Su a better idea of the process. Dr. Tzeng was instructed to assist at the defense table.

10. At one point the word "kitchen" was omitted in the translation, and instead of translating the sum of "$250," an interpreter said "$200."

11. The government pointed out that the interpreter was using "mixed tenses and odd verbs and what-not." Although the transcript refers to a Mr. Cairo as the interpreter, the actual interpreter probably was Mr. Wong. The record is not clear as to whether Mr. Wong was certified in Cantonese.

Yan declared that he had no State Department certification for Cantonese, but was certified by "Berdez Services" (sic?). Dr. Tzeng again informed the court that he was not certified in Cantonese. Mr. Wong assumed the task of translating for Mr. Mei, even though there was no indication at that time that he had State Department certification in Cantonese. When witness Mei said he was having difficulty understanding the interpreter, the judge asked Mr. Chan to "come up and try for a few minutes."

No additional or substantial problems appeared to surface during the remainder of the trial.[12] On April 29, 1993, the judge said he thought the interpreters were doing "a pretty successful job" and the translation was "coming through pretty well." Defense counsel voiced no disagreement.

## ANALYSIS

### I. General Principles

■ The principal question presented to us on this appeal is whether, during the course of his trial, Ko was deprived of any right secured by the Interpreter Act or by the Constitution of the United States. This is no trivial issue, for it goes to the essence of a defendant's right to a fair trial. If a defendant who is unable to speak and understand English is compelled to face criminal charges without access to effective translation of the proceedings by a competent and impartial interpreter, then his ability to present a defense may be substantially undermined, and there is "a serious possibility of grave injustice." *State v. Masato Karumai*, 101 Utah 592, 126 P.2d 1047, 1050 (Utah 1942). When the accused cannot understand the proceedings, then the trial, to him, is no more than "a babble of voices," *United States ex rel. Negron v. New York*, 434 F.2d 386, 388 (2d Cir.1970), and he cannot fairly be said to be present at his own trial. ROSEANN DUENAS GONZALEZ, VICTORIA F. VASQUEZ, & HOLLY MIKKELSON, FUNDAMENTALS OF COURT INTERPRETATION § 3, at 59 (1991).

■ In *Negron*, writing for a unanimous court, Judge Irving Kaufman described as "nearly self-evident [the] proposition that an indigent defendant who could speak and understand no English would have a right to have his trial proceedings translated so as to permit him to participate effectively in his own defense, provided he made an appropriate request for this aid." 434 F.2d at 389 (footnote omitted); *accord, People v. Ramos*, 26 N.Y.2d 272, 309 N.Y.S.2d 906, 258 N.E.2d 197, 198 (N.Y.1970). In *United States v. Carrion*, 488 F.2d 12, 14 (1st Cir.1973) (per curiam), *cert. denied*, 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974), the court concisely synopsized the applicable principles as follows:

> Clearly, the right to confront witnesses would be meaningless if the accused could not understand their testimony, and the effectiveness of cross-examination would be severely hampered.... If the defendant takes the stand in his own behalf, but has an imperfect command of English, there exists the additional danger that he will either misunderstand crucial questions or that the jury will misconstrue crucial responses. The right to an interpreter rests most fundamentally, however, on the notion that no defendant should face the Kafkaesque spectre of an incomprehensible ritual which may terminate in punishment.

(citations omitted). Accordingly, "a defendant whose fluency in English is so impaired that it interferes with his right to confrontation or his capacity, as a witness, to understand or respond to questions has a constitutional right to an interpreter." *United States v. Jong Moon Lim*, 794 F.2d 469, 470 (9th Cir.), *cert. denied*, 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986).

In 1988, in order to vindicate the foregoing rights, the Council of the District of Columbia enacted the Interpreter Act. The purpose of the Act was "to assist hearing-impaired and non-English speaking persons as they participate in proceedings of the D.C. Court System, the Council of the District of Columbia, and the District's Adminis-

---

12. Nina or Mina Pang provided interpretation on May 3, 1993, but the record is not clear as to whether there was any formal inquiry into her certification, or how her services were acquired.

trative Agencies." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON GOVERNMENT OPERATIONS, REPORT ON BILL 7-108, at 1 (June 11, 1987) (Committee Report). The statute provides, *inter alia*, that in any criminal prosecution the court shall, upon the request of a "communication-impaired" person,[13] appoint a qualified interpreter to interpret the proceedings for him and to interpret his testimony. D.C.Code § 31-2702(a). The Interpreter Act also establishes an "Office of Interpreter Services" (now the OCIS), which is required, *inter alia*, to set standards and qualifications for interpreters, to maintain a current list of qualified interpreters, to coordinate requests for interpreters, and to pay for the salaries, fees, expenses and costs incident to providing interpreter services. D.C.Code § 31-2711(b).[14]

In the present case, it is undisputed that the testimony at trial was in fact interpreted for the witnesses and for the defendant. Ko does not claim, nor can he, that he was compelled to go to trial in a language which he did not understand. Rather, Ko challenges the procedures utilized in the trial court to establish the competence of the interpreters, and he claims that some or all of them lacked the requisite impartiality to carry out their responsibilities fairly.

## II.  Competence and Bias Issues [15]

When Ko's trial began, there were two sets of interpreters. One set had been retained by the United States Attorney's office to provide interpreter services for government witnesses. The other set had been appointed by the trial court. In mid-trial, and after questions had been raised about the impartiality of the government's interpreters, the trial court decided that it should enter into a subcontract with the government's interpreters.

Ko contends that D.C.Code § 31-2704 required the trial judge to make a separate on-the-record determination, with respect to each of the fourteen witnesses who testified through an interpreter, that the particular interpreter was able to provide "effective communication" with that witness.

■ D.C.Code § 31-2704 provides as follows:

> Before appointing an interpreter, an appointing authority shall make a preliminary determination that the interpreter is able to accurately communicate with and translate information to and from the communication-impaired person involved. If the interpreter is not able to provide effective communication with the communication-impaired person, the appointing authority shall appoint another qualified interpreter.

Although this code section requires the appointing authority, prior to appointment of an interpreter, to "make a preliminary determination that the interpreter is able to accurately communicate with and translate information to and from the communication-impaired person involved," the record does not reflect that the trial court carried out this statutory mandate when it decided to enter into a subcontract with the government's interpreters. Nor does the record indicate any objection by defense counsel. Therefore, we review this matter for plain error.

■ The government interpreters who were assigned a broader role as court interpreters continued to be paid directly by United States Attorney's office and were required to report daily to that office as a condition of payment. Mainly because of this procedure, Ko argues on appeal, that the interpreters were biased against him. This contention

---

13. "'Communication-impaired person' means a person whose hearing is impaired or who does not speak English." D.C.Code § 31-2701(2).

14. We have previously decided other cases involving issues under the Interpreter Act. See, for example, *Gonzalez v. United States*, 697 A.2d 819 (D.C.1997); *Redman v. United States*, 616 A.2d 336 (D.C.1992); *Barrera v. United States*, 599 A.2d 1119 (D.C.1991).

15. For other cases involving interpreter competence see, for example, *United States v. Urena*, 27 F.3d 1487, 1491-92 (10th Cir .), *cert. denied*, 513 U.S. 977, 115 S.Ct. 455, 130 L.Ed.2d 364 (1994); *United States v. Huang*, 960 F.2d 1128, 1135-36 (2d Cir.1992).

was not raised in the trial court, and we review it for plain error.

First, the government now concedes that the payment process constituted error, but not plain error, once the government's interpreters were assigned to a broader role by the court as interpreters both for the defendants and the government's witnesses. Second, however, we see nothing on the record before us to support Ko's contention that the interpreters who were not put through a preliminary determination of competence performed inadequately, or that those who were paid by the government were biased. Although there were one or two minor instances in which the accuracy of the interpretation was questioned, there were no material flaws in the translation. When accusations of bias were raised by Ko, the trial court addressed them and found they had no merit. For example, when Ko described two of the interpreters as "known friends" of government witness Tony Chang, the trial judge conducted *voir dire* of the interpreters and found that the accusations were not true and "mostly nonsense." Similarly, the trial judge determined no bias flowed from a contact between the interpreter and an F.B.I. agent during the defense cross-examination of a government witness. Nonetheless, the judge gave instructions that the interpreters should not talk with persons connected with the trial, including the F.B.I. and District police officers.

Third, on the record before us, we believe that the trial judge managed to resolve complex interpretation issues without compromising minimal requirements of fundamental fairness, as reflected in the Interpreter Act. Defense counsel both acquiesced in the trial court's solutions to a complicated problem and failed to object to procedures for payment of interpreters retained initially by the United States Attorney's office. Therefore, we see no plain error.

Finally, we note that after the en banc oral argument, the government called this court's attention to Administrative Order No. 98–12 (March 31, 1998), issued by the Chief Judge of the Superior Court, the Honorable Eugene N. Hamilton ordering:

> That in all criminal and juvenile delinquency proceedings before the Superior Court, any person who interprets for the record the testimony of, any hearing-impaired or non-English speaking person shall be appointed by the Court, and compensated by the Court.[16]

For the foregoing reasons, Ko's convictions must be affirmed.[17]

*So ordered.*

---

16. Since Order No. 98–12 was issued after this case was argued en banc, we express no view whether the statutory scheme requires adoption of such a practice.

17. Ko's remaining contentions on appeal do not require plenary consideration.

Ko claims that the police intimidated two of his witnesses. When the issue arose at trial, however, his counsel did not move for a mistrial, nor did he request an evidentiary hearing on his claims. Instead, he elected to present testimony about the alleged intimidation to the jury, in an effort to undermine the government's case. Under these circumstances, Ko has not preserved the issue for appeal, nor has he shown that the trial judge's failure, *sua sponte*, to take some unspecified corrective action, not requested below, amounted to plain error. *See United States v. Olano*, 507 U.S. 725, 731–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

Ko next asserts that the prosecution violated his rights under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), by allegedly inducing a prosecution witness to discuss the case with Ko outside the presence of Ko's attorney. When this issue was raised at trial, the judge declined to rule on it without a relevant evidentiary record. The judge stated instead that if Ko were convicted, defense counsel could file an appropriate post-trial motion to which the government could then respond, so that the allegations could be resolved in an orderly manner. Ko's attorney interposed no objection to this procedure, but no post-trial motion was filed. No meaningful record on the issue is before us, and Ko therefore has not preserved the point for appeal. Moreover, the evidence of any *Massiah* violation is entirely speculative.

Ko claims for the first time on appeal that Count 5 of the indictment, which charged Ko with threatening both Sau Wong Lam and Ji Ying Mei, was duplicitous. By failing to assert

the claim of duplicity at trial, Ko waived it. *See, e.g., Nichols v. United States,* 343 A.2d 336, 340–41 (D.C.1975). The judge did not "constructively amend" the indictment by providing the jury with a supplemental verdict form which dealt appropriately with any unanimity problem.

Ko asserts that there was insufficient evidence to support his conviction of unlawful possession of unregistered ammunition. Ko himself testified, however, that after he found in his office ammunition allegedly owned by Tony Cheng, he placed the ammunition in his desk drawer but made no attempt for several months to return the ammunition to Cheng. There was also testimony that Ko threatened Lam with a pistol. Viewed in the light most favorable to the prosecution, the evidence was sufficient. *See Bernard v. United States,* 575 A.2d 1191, 1192 (D.C.1990).

Ko presents two other contentions related to his unregistered ammunition conviction, but neither requires reversal. First, contrary to Ko's position, the trial judge did not commit plain error by failing to intervene, *sua sponte,* in the absence of any objection, after a prosecution witness described the ammunition as "live." Similarly, the judge's failure to take any action on his own initiative when the prosecutor alluded to Ko's parole status was not "plain error"; the fact that Ko was on parole had been brought out by defense counsel, and it was arguably relevant to Ko's claim that he had "forgotten" about the ammunition. *See Irick v. United States,* 565 A.2d 26, 31 (D.C.1989).

Finally, the trial judge did not abuse his broad discretion by permitting Dr. Larry Hammack to testify as a rebuttal witness, *see Fitzhugh v. United States,* 415 A.2d 548, 551 (D.C.1980), or by admitting, over a hearsay objection, the testimony of prosecution witness Tun Cung Yam that his daughter asked Yam to deliver a check to Ko's sister. *See Burgess v. United States,* 608 A.2d 733, 740 (D.C.1992); *United States v. Shepherd,* 739 F.2d 510, 514 (10th Cir.1984) ("An order or instruction is, by its nature, neither true nor false and thus cannot be offered for its truth.").