IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 489-03






JOSE MEDRANO GARCIA, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FOURTEENTH COURT OF APPEALS


BRAZORIA COUNTY






 Keasler, J., delivered the opinion of the Court joined by Meyers, Price, Womack,
Johnson, Hervey, Holcomb, and Cochran, JJ. Keller, P.J., filed a concurring opinion in
which Womack, J., joined.


O P I N I O N 



 Jose Medrano Garcia does not speak English. His jury trial had mostly English-speaking witnesses and court personnel, and the proceedings were not translated. He did not
affirmatively waive his right to translation and was apparently unaware of that right. We must
decide whether Garcia's conviction violates the Confrontation Clause of the Sixth Amendment
to the United States Constitution. We conclude that it does.

Facts and Procedural History


 Garcia was born in Matehuala, Mexico, and attended school there through the ninth
grade. He eventually came to the United States with a "green card." He does not speak, read,
or write English to any appreciable degree.

 In January 2001, Garcia was introduced to the American legal system when he was
charged with a sexual assault that had occurred several months earlier. He pleaded not guilty,
was released on bond, and hired attorney Ken Bishop to help him maneuver through the system. 
Bishop spoke no Spanish, so the two communicated solely through Bishop's bilingual legal
assistant, Herminia Montoya.

Pretrial


 That summer, proceedings began with a pretrial hearing on July 23, 2001. The hearing
encompassed pretrial motions as well as voir dire issues. The court reporter's record reflects
that Aida Aluizo was "duly sworn as English/Spanish interpreter by Deputy District Clerk" for
that hearing. The clerk's record also contains a document, dated July 23, 2001, in which
Aluizo swears that she "will truly interpret for the witness, Joe Medrano Garcia, the testimony
for which he/she may give in the cause now on trial."

 During voir dire, defense counsel prepared the panel for the presence of an interpreter
during the trial. He told them that Garcia "doesn't speak English, so we've got some
interpreters here." He asked if that might matter to anyone. One venireperson asked whether
Garcia was a United States citizen, and counsel responded, "I think that - he's not a citizen, but
he's here on what we call a, 'Green Card' legally."

 Regarding Garcia's testifying, defense counsel told the panel that Garcia did not have
to testify, but that he would: "I can tell you right now that Mr. Garcia is going to testify. He
wants to testify, to tell you his version of this incident, so you will be hearing from him. Now
it will be through a translator. So this is one reason I asked the question a little bit earlier and
mentioned about the method by which we're going to do it because he's just not quite fluent
enough in English to be able to understand the questions possibly and/or respond without
having a translator . . . ."

Trial


 Trial began the next day. There is no mention in either the court reporter's record or
the clerk's record of an interpreter translating the testimony throughout the trial. After the
indictment was read and the court asked how the defendant would plead, Garcia did not answer. 
Defense counsel responded, "Not guilty, Your Honor." 

 The court then introduced Montoya to the jury as defense counsel's legal assistant. The
judge said, "She translates pretty frequently in the courts, so she's hired by the Court."

 The State presented testimony from seven witnesses. Most relevant to the issue before
us today was the testimony of the complainant, the complainant's mother, and the police
officer. The complainant, Erica Mendoza, testified that she is Garcia's cousin. She said that
Garcia had asked her to go to the unemployment office with him so that she could translate for
him. She agreed to do so, but when he came over, she said she would not be able to go after
all. It was then, she said, that he sexually assaulted her. 

 Mendoza's mother, Rosalina Seladon, testified later, and the court reporter's record
reflects that she "testified through the duly sworn interpreter." There were some breaks during
her testimony at which point there were "discussion[s] between interpreter and witness in
Spanish." The judge eventually instructed Aluizo to "wait until the witness is through speaking"
before translating. The "clerk's worksheet" in the clerk's record reflects that, during the
testimony of "Angelina Celedon" (who is apparently the same person as Rosalina Seladon),
"[Aluizo] translated for her." 

 The police officer who served the arrest warrant on Garcia testified. During cross-examination, defense counsel asked the officer if he was "aware that Jose Garcia only spoke
Spanish?" The officer responded, "I [was] told that, but from speaking to him I could tell that
he could speak a little English."

 The defense presented the testimony of the complainant and Garcia. The court
reporter's record reflects that Garcia was sworn in "through the interpreter" and testified
"through the duly sworn interpreter." He testified that he did not assault Mendoza; instead, she
approached him and consented to sexual contact between them.

 When the prosecutor cross-examined Garcia and asked if he had heard his attorney
questioning the victim, Garcia replied, "No, because I don't understand a lot of English." On
re-direct, defense counsel asked if Garcia had understood all of the questions that the
prosecutor had asked him, and Garcia said, "I wasn't able to understand well, very well."

 The jury found Garcia guilty of sexual assault, and the parties reached an agreement on
punishment. There was some concern about whether the punishment agreement constituted
a guilty plea, and the judge said, "Well, I think what I need to do is give him all the admonitions
any way." So Garcia approached the bench and at that time Aluizo was "called as the
Spanish/English interpreter for the defendant, having been duly sworn as the Spanish/English
Interpreter on 7/23/01."

 The agreement was that Garcia would serve eight years in prison and waive his right to 
appeal. The court then came to the sex offender registration requirements. The judge
discussed having Aluizo "read those" to Garcia. He told defense counsel to "go over that" with
Aluizo and "make sure he understands those and then I'll come back before you and then we'll
finish the thing." The judge then said that "the record will reflect that the supplemental
admonitions to defendant for sex offender registration requirements have been read by the
translator . . . ."

Motion for New Trial


 Garcia filed a motion for new trial arguing that his waiver of appeal had not been
knowing and voluntary because "his comprehension of the English language and American
judicial system was insufficient." He also claimed that he received ineffective assistance of
counsel at trial, and he claimed generally that the verdict was contrary to the law and the
evidence. A hearing was held on the motion on September 28, 2001. 

 At the hearing, Garcia's sister-in-law testified that Garcia does not speak English. 

 Aluizo testified that she was sworn in as the interpreter for this case. But she was not
called upon to interpret the English-speaking testimony for Garcia. Rather, she interpreted
Garcia's Spanish testimony for the jury. When asked why she did not simultaneously interpret
the testimony for Garcia, she said, "I don't - I don't really remember why I didn't sit beside
him. Normally I do. I sat at the probation table by the counselor table and - but I really don't
know why I didn't sit beside him. I did tell [Montoya], Mr. Bishop's secretary, that normally
I would sit beside the Defendant and I don't recall what she responded to me and, so, I just sat,
you know, on the side table." She did not see Montoya interpreting for Garcia. And during
punishment, she never translated what an appeal was, its importance, or possible appellate
issues.

 Montoya testified that Garcia always spoke Spanish and Bishop spoke English so she
translated for them. But she did not perform any type of interpretation for Garcia during the
trial. She sat in between Garcia and Bishop. Nobody instructed her to translate the witnesses'
testimony for Garcia. She didn't do it because she was "afraid that I would be called down; and
I didn't want to be called down." She was afraid a translation would disrupt the proceedings. 
Nobody else translated for Garcia. Before this case she had never been called upon to sit
during a trial and give an ongoing translation, and she was not sworn in as an interpreter in this
case. Garcia did not realize that he had been found guilty until they left the courtroom. 
Montoya told him he had been found guilty in the stairway outside the courtroom, and he was
surprised and shocked.

 Bishop testified that he speaks very little Spanish and Garcia speaks even less English. 
They had an interpreter every time they spoke. There was no translation by Montoya during
trial. Bishop never advised Garcia that he had a right to an interpreter. Garcia could not
understand the victim's testimony and therefore could not assist Bishop. Garcia did not
understand that he had been found guilty until after the trial. Bishop never explained to Garcia
what an appeal was. On cross-examination, Bishop admitted that Montoya had sat in between
him and Garcia, and he could have asked her a question to ask Garcia, but he did not avail
himself of this. He admitted that he never objected to the court or requested a translation for
Garcia.

 Garcia testified with the aid of an interpreter. The "clerk's worksheet" for the motion
for new trial hearing states, "Rosario Rivera Interpreter," and states, "Presario Rivera
translating to Defen." Garcia testified that nobody translated the trial for him and he did not
understand any of the English testimony. He had no idea that he had a right to a translator and
never told anyone that he did not want a translator. 

 After that hearing, the judge made a remark which he put on the record during the next
hearing. On October 8, 2001, the hearing scheduled for argument on the motion, the judge said
the following:

 Mr. Davis had talked to me about a remark that I had made after our last hearing,
that was in the presence of Mr. Davis and the prosecutor, that . . . I think I said
something to the effect that at some point in the trial I had happened to notice
that Mr. Ken Bishop - he was seated over there at counsel table, on the inside;
and then, [Montoya] was next; and then, the defendant and then [Aluizo], I think
was on the outside. And sometime during the trial, I noticed that the testimony
was not being translated. At what stage of the trial, seems like it was pretty well
into the trial . . . it would have been sometime in the latter part or middle or two-third - I don't remember when - of the guilt-innocence stage. And I had
mentioned to Mr. Davis that I don't recall what - who was testifying, who's
testimony was significant testimony or insignificant testimony; but just don't
recall. But I thought - I didn't remember whether I had remarked to anybody
about it or not. If I did remark on the record, I guess it would be eventually on
the record somewhere.


 Defense counsel then urged a new trial due to the lack of translation and ineffective
assistance of counsel. Counsel argued that the lack of translation violated, among other things,
his client's Sixth Amendment right to confront the witnesses against him. The State responded
that confrontation clause violations must be raised at trial. 

 The trial judge denied Garcia's motion for new trial. He noted that a written motion had
never been filed for an interpreter - only an oral motion. The judge also noted that there was
an oath in the record that Aluizo would interpret, but that was in response to the State's request
for an interpreter. The judge considered the fact that the ultimate issue in the case was whether
there was sexual contact, and that issue was fully explored at trial. The judge concluded by
recognizing that an interpreter had been sworn, but "Bishop had two Spanish-speaking assistants
with him flanking [Garcia] at the time of trial and during the entire time of the trial." Finally,
the judge concluded that Garcia had not knowingly and intelligently waived his right to appeal.

Court of Appeals


 On appeal to the Court of Appeals, Garcia argued that the lack of translation during his
trial violated, among other things, the Sixth Amendment's Confrontation Clause. The State
responded that Garcia failed to preserve error and any error would be harmless. 

 The Court of Appeals, in a memorandum opinion, stated that "if there is evidence an
interpreter was present and available to help the defendant, a trial court does not err in failing
to appoint one." (1) The court said that in this case, Bishop's legal assistant was fluent in both
English and Spanish and sat next to Garcia during the trial. (2) The Court concluded that Garcia
"had a translator available but did not make use of her," and as a result, the trial court did not
err in failing to appoint a second interpreter. (3)

 We granted all four grounds of Garcia's petition for discretionary review. The first
ground asks whether "a Mexican citizen who speaks and understands little or no English [can]
be tried without benefit of translation, without knowledge he had a right to translation, and
without affirmative waiver of the right to have the proceedings translated" under the federal
constitution. Because of our resolution of this ground, we need not reach the remaining
grounds.

Analysis


 The Sixth Amendment to the Constitution guarantees an accused in a criminal
prosecution the right to be confronted with the witnesses against him. (4) One of the most basic
of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the
courtroom during his trial. (5) The right to be present includes the right to understand the
testimony of the witnesses. (6) This is because, as Professor Wigmore notes, "no situation is
more full of anguish than that of an innocent accused who cannot understand what is being
testified against him." (7) We have previously acknowledged that providing an interpreter to an
accused who does not understand English is required by the Confrontation Clause. (8) Indeed, we
long ago recognized the prevalence of this particular problem in our state:

 [W]e know that in this State, especially along the Rio Grande border, our
citizenship is comprised of Latin Americans who speak and understand only the
Spanish language. These citizens, as also nationals of the Republic of Mexico
(which was the status of appellant), when brought before the courts of this State
charged with crimes against the laws of this State, are entitled to be tried
according to the Constitution and laws of this State. This, of necessity, means
they are entitled to be confronted by the witnesses under the same conditions
as apply to all others. Equal justice so requires. The constitutional right of
confrontation means something more than merely bringing the accused and the
witness face to face; it embodies and carries with it the valuable right of
cross-examination of the witness. Unless appellant was in some manner, either
through his counsel or an interpreter, afforded knowledge of the testimony of
the witness, the right of cross-examination could not be exercised by him. (9)

 

The United States Supreme Court has also recognized that the right to confrontation and the
right to be present at one's trial extend to foreign nationals. (10) 

 The Arizona Supreme Court explains that being present at a trial without understanding
the language of the witnesses "would be as though a defendant were forced to observe the
proceedings from a soundproof booth or seated out of hearing at the rear of the courtroom,
being able to observe but not comprehend the criminal processes whereby the state had put his
freedom in jeopardy." (11) And the United States Court of Appeals for the First Circuit notes that
"[t]he right to an interpreter rests most fundamentally . . . on the notion that no defendant
should face the Kafkaesque (12) spectre of an incomprehensible ritual which may terminate in
punishment." (13) Or as Judge Ferguson of the Ninth Circuit has said, "presence can have no
meaning absent comprehension." (14) 

 The leading case in this area, and a case strikingly similar to this one, is United States
ex rel. Negron v. New York. (15) There, the Second Circuit affirmed the trial court's grant of
habeas relief due to Negron's being tried without an interpreter. The government did not
dispute that Negron understood no English, counsel spoke no Spanish, and there was no
translation during trial. In granting habeas relief, the court noted that "most of the trial must
have been a babble of voices" (16) to Negron. The court concluded that, "regardless of the
probabilities of his guilt, Negron's trial lacked the basic and fundamental fairness required by
the due process clause of the Fourteenth Amendment." (17) As the court explained, "Negron
deserved more than to sit in total incomprehension as the trial proceeded." (18) 

 In this case, as in Negron, the State does not dispute that Garcia does not speak English
and there was no translation during trial. Indeed, it concedes in its brief that at the hearing on
the motion for new trial, Garcia "established that he does not speak English and did not receive
simultaneous translation of the witnesses' testimony." Garcia, like Negron, sat in "total
incomprehension" (19) of his trial. He understood almost no English, and all of the witnesses but
one testified in English. He received no translation of the testimony. To Garcia, like Negron,
the trial must have been "a babble of voices." (20) Garcia experienced exactly what the Sixth
Amendment protects against.

No Interpreter vs. Ineffective Interpreter


 Despite this, the State argues that Garcia was not actually deprived of an interpreter at
all. Instead, he had an interpreter - Montoya - who simply did not interpret. According to the
State, the judge acknowledged the presence of Montoya as Garcia's interpreter both during voir
dire and at the beginning of trial. So the State contends that Garcia's actual claim in this appeal
is that he had an ineffective interpreter, not that he was denied an interpreter. And since
Garcia's claim concerns an ineffective interpreter, the State continues, Garcia was required
to preserve the error by objecting at trial.

 The State's characterization of the facts is not entirely accurate. Montoya was not even
implicitly recognized as an interpreter during voir dire. On the contrary, the record reflects
that Aluizo, not Montoya, was "duly sworn as English/Spanish interpreter by Deputy District
Clerk" at that hearing. 

 As for trial, it is true that the judge told the jury at the beginning of trial that Montoya
"translates pretty frequently in the courts, so she's hired by the Court." But Montoya testified
at the hearing on the motion for new trial that she did not perform any type of interpretation
for Garcia during the trial. Nobody instructed her to translate the witnesses' testimony for
Garcia, and she did not do so. Indeed, she had never once been called upon to sit during a trial
and give an ongoing translation, and she was not sworn in as an interpreter in this case.

 The fact that Montoya was bilingual and sat next to Garcia did not automatically elevate
her to the status of courtroom interpreter, regardless of the judge's statements to the jury. 
"One is not necessarily competent to translate legal proceedings because he or she is
bilingual." (21) On the contrary, "[c]ourtroom interpretation is a sophisticated art, demanding not
only a broad vocabulary, instant recall, and continuing judgment as to the speaker's intended
meaning, but also the ability to reproduce tone and nuance, and a good working knowledge of
both legal terminology and street slang." (22) 

 We disagree with the State. Garcia is not complaining about the effectiveness of
Montoya as an interpreter because Montoya was not his court interpreter. She was not sworn
in by the court to interpret the trial for Garcia, she was not told to interpret the trial for Garcia,
and she did not interpret the trial for Garcia. Instead, Garcia is complaining that he was denied
his right to confrontation because the proceedings were not translated for him.

Waiver


 Nevertheless, we still must address the State's contention that Garcia waived error in
his failure to object at trial to the lack of a translation. There is support for the State's
contention that confrontation rights generally, and the right to an interpreter specifically, can
be waived. We recognized that at least as far back as 1948. (23) And we repeated it in the
interpreter/confrontation cases that followed, through 1971. (24) But in 1979 in Baltierra, we
went a step further. There we explained that, although the right to an interpreter can be waived,
it is not deemed waived if the trial court is aware "that an accused does not speak and
understand the English language." (25) The State concedes in its brief that Baltierra "provides an
exception to the objection requirement when the trial court is aware that an accused does not
speak or understand English."

 We elaborated on the Baltierra exception the following year in Briones v. State. (26) That
case, unlike Baltierra, involved a guilty plea. We noted that the defendant in Briones, as part
of his plea, had been informed in Spanish of his right to confrontation and he had waived that
right. We concluded that his waiver was "voluntarily and intelligently entered" (27) and was "an
intentional relinquishment or abandonment of a known right." (28) And we recognized that
Briones was different from Baltierra and Ex parte Nanes (29) because, in those cases, the
defendants pleaded not guilty and did not waive their rights to confrontation. They "could not
fully exercise those rights because they did not understand the English language." (30)

 Our leading error-preservation case today was handed down thirteen years after Briones. 
In Marin v. State, (31) we explained that "our system may be thought to contain rules of three
distinct kinds: (1) absolute requirements and prohibitions; (2) rights of litigants which must
be implemented by the system unless expressly waived; and (3) rights of litigants which are to
be implemented upon request." (32) 

 Rights contained within the last category, we said, are subject to procedural default if
the litigant does not request them at trial. The "litigant's failure to speak up" is enough to
render the right forfeited. But rights in the second category hand "do not vanish so easily. 
Although a litigant might give them up and, indeed, has a right to do so, he is never deemed to
have done so in fact unless he says so plainly, freely, and intelligently, sometimes in writing
and always on the record." (33) Regarding these rights, "the judge has an independent duty to
implement them absent an effective waiver by him. As a consequence, failure of the judge to
implement them at trial is an error which might be urged on appeal whether or not it was first
urged in the trial court." (34)

 The Waco Court of Appeals recently concluded that the right to an interpreter is a
category-two Marin right - a right that must be implemented by the system unless expressly
waived. (35) This conclusion makes sense for two reasons.

 First, placing the right to an interpreter in Marin's second category is a logical
extension of our caselaw on the subject. Before Marin, we had concluded that the right to an
interpreter could be waived, but that it would not be deemed waived if the trial judge was aware
that the defendant had a language problem. In other words, if the judge is aware of the
defendant's language barrier, the judge has an independent duty to ensure that the proceedings
are interpreted for the defendant, absent the defendant's knowing and intelligent waiver. A
category-two placement is consistent with our pre-Marin caselaw.

 Additionally, requiring the right to an interpreter to be implemented unless waived
makes sense given the nature of the right. It would be illogical to require a non-English-speaking defendant to assert his right to an interpreter in a language he does not understand
when he may very well be unaware that he has the right in the first place. The Negron court
said it well:

 Nor are we inclined to require that an indigent, poorly educated Puerto Rican
thrown into a criminal trial as his initiation to our trial system, come to that trial
with a comprehension that the nature of our adversarial processes is such that
he is in peril of forfeiting even the rudiments of a fair proceeding unless he
insists upon them. Simply to recall the classic definition of a waiver -- "an
intentional relinquishment or abandonment of a known right,"-- is a sufficient
answer to the government's suggestion that Negron waived any fundamental right
by his passive acquiescence in the grinding of the judicial machinery and his
failure to affirmatively assert the right. For all that appears, Negron, who was
clearly unaccustomed to asserting "personal rights" against the authority of the
judicial arm of the state, may well not have had the slightest notion that he had
any "rights" or any "privilege" to assert them. (36)


The Negron court pointed out that in Pate v. Robinson, (37) the Supreme Court of the United
States held that "[w]here the evidence raises a 'bona fide doubt' as to a defendant's competence
to stand trial, the judge on his own motion must impanel a jury and conduct a sanity hearing"
pursuant to Illinois statutes. The Supreme Court also recognized in Pate that "it is
contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently
'waive' his right to have the court determine his capacity to stand trial." (38)

 In Negron, the court concluded that the same is true when it appears to the trial court
that the defendant has a language disability. The court said that "[t]he least we can require is
that a court, put on notice of a defendant's severe language difficulty, make unmistakably clear
to him that he has a right to have a competent translator assist him, at state expense if need be,
throughout his trial." (39) The First Circuit agrees, placing the burden squarely on the trial court's
shoulders. In Carrion, the court stated that "[the trial court should] make unmistakably clear
to a defendant who may have a language difficulty that he has a right to a court-appointed
interpreter if the court determines that one is needed, and, whenever put on notice that there
may be some significant language difficulty, the court should make such a determination of
need." (40)

 We conclude that, when a trial judge is aware that the defendant has a problem
understanding the English language, the defendant's right to have an interpreter translate the
trial proceedings into a language which the defendant understands is a category-two Marin
right. In these circumstances, the judge has an independent duty to implement this right in the
absence of a knowing and voluntary waiver by the defendant. The judge may become aware of
the defendant's language problem either by being informed of it by one or both parties or by
noticing the problem sua sponte. 

 In this case, the record reflects that at trial the judge was aware that Garcia needed a
translator. The pretrial proceedings were translated for Garcia. Defense counsel discussed
Garcia's language difficulty during voir dire. Garcia himself testified that he had been unable
to understand the complainant's testimony. And the judge admitted on the record that at "some
point" during the trial he had become aware that the proceedings were not being translated for
Garcia. Since the judge was aware that Garcia had difficulty understanding English, the judge
was required to ensure that the trial proceedings were translated into a language which Garcia
could understand, absent an effective waiver by Garcia. And Garcia did not knowingly or
voluntarily waive his right to an interpreter. Garcia's Sixth Amendment right to confront the
witnesses against him was violated.

Conclusion


 "They deafened my ears with their gabble." (41) So said Kafka's Josef K. of his trial. 
Garcia might well make the same assertion. Like Negron, Garcia "deserved more than to sit
in total incomprehension as the trial proceeded." (42) We sustain Garcia's first ground for review
and dismiss the remaining grounds. We reverse the Court of Appeals' judgment and remand
the case to that court for an assessment of harm. (43)


DATE DELIVERED: March 24, 2004

PUBLISH 

1. Garcia v. State, No. 14-01-00949-CR, slip op. at 2 (Tex. App. - Houston [14th],
November 14, 2002) (not designated for publication).
2. Ibid.
3. Ibid.
4. U.S. Const. Amend. VI; Davis v. Alaska, 415 U.S. 308, 315 (1974).
5. Illinois v. Allen, 397 U.S. 337, 338 (1970). See also United States v. Gagnon, 470
U.S. 522, 526 (1985).
6. Baltierra v. State, 586 S.W.2d 553, 556-57 (Tex. Crim. App. 1979). See also Luu
v. People, 841 P.2d 271, 273 n.3 (Colo. 1992); State v. Heredia, 754 A.2d 114, 122 (Conn.
2000); Martinez Chavez v. State, 534 N.E.2d 731, 737 (Ind. 1989); State v. Calderon, 270
Kan. 241, 245 (Kan. 2000); 5 John W. Wigmore, Evidence § 1393 (Chadbourn Rev. Ed.
1974).
7. Wigmore, supra note 6.
8. See Baltierra, 586 S.W.2d at 556-59; Ex Parte Marez, 464 S.W.2d 866, 867 (Tex.
Crim. App. 1971).
9. Garcia v. State, 151 Tex. Crim. 593, 601, 210 S.W.2d 574, 580 (1948). See also
Baltierra, 586 S.W.2d at 557.
10. Wong Wing v. United States, 163 U.S. 228, 238 (1896).
11. State v. Natividad, 526 P.2d 730, 733 (Ariz. 1974).
12. See Franz Kafka, The Trial (Penguin 1953).
13. United States v. Carrion, 488 F.2d 12, 14 (1st Cir. 1973). See also United States
v. Quesada Mosquera, 816 F. Supp. 168, 173 (E.D. N.Y. 1993); Ko v. United States, 722
A.2d 830, 834 (D.C. 1998); People v. Escalante, 627 N.E.2d 1222, 1228 (Ill. App. 1994);
Martinez v. State, 449 N.E.2d 307, 309 (Ind. App. 1983); State v. Lopes, 805 So. 2d 124, 126
n.2 (La. 2001); Commonwealth v. Garcia, 399 N.E.2d 460, 470 (Mass. 1980); State v. Woo
Won Choi, 781 P.2d 505, 508 (Wash. App. 1989); State v. Neave, 344 N.W.2d 181, 187
(Wisc. 1984).
14. Tejeda-Mata v. I.N.S., 626 F.2d 721, 728 (9th Cir. 1980) (Ferguson, J., dissenting).
15. 434 F.2d 386 (2d Cir. 1970). See also Baltierra, 586 S.W.2d at 556, 559. 
16. Negron, 434 F.2d at 388. See also People v. Aguilar, 677 P.2d 1198, 1204 (Cal.
1984); People v. Avila, 797 P.2d 804, 805 (Colo. App. 1990); Ko, 722 A.2d at 834; Martinez,
449 N.E.2d at 309; State v. Karaarslan, 619 A.2d 1346 (N.J. Super. 1993).
17. Negron, 434 F.2d at 389.
18. Id. at 390. See also United States v. Si, 333 F.3d 1041, 1042 (9th Cir. 2003);
Escalante, 627 N.E.2d at 1227; Neave, 344 N.W.2d at 187.
19. Negron, 434 F.2d at 390.
20. See id. at 388.
21. Virginia E. Hench, What Kind of Hearing? Some Thoughts on Due Process for the
Non-English-Speaking Criminal Defendant, 24 T. Marshall L. Rev. 251 (1999), citing
Attorneys Guide to the Use of Court Interpreters, With An English and Spanish Glossary
of Criminal Law Terms, 8 U. Cal. Davis L. Rev. 471, 479 (1975).
22. Id., citing Sanders, Libertad and Justice for All: A Shortage of Interpreters is
Leaving the Courts Speechless, Time Magazine 65 ( May 29, 1989), and Attorneys Guide
to the Use of Court Interpreters, With An English and Spanish Glossary of Criminal Law
Terms, supra note 21. 
23. Garcia, 210 S.W.2d at 579.
24. See Field v. State, 232 S.W.2d 717, 718 (Tex. Crim. App. 1950) (op. on reh'g);
Marez, 464 S.W.2d at 867.
25. Baltierra, 586 S.W.2d at 559.
26. 595 S.W.2d 546 (Tex. Crim. App. 1980).
27. Briones, 595 S.W.2d at 548.
28. Ibid.
29. 558 S.W.2d 893 (Tex. Crim. App. 1977).
30. Briones, 595 S.W.2d at 548.
31. 851 S.W.2d 275 (Tex. Crim. App. 1993).
32. Id. at 279.
33. Id. at 280.
34. Ibid.
35. See Guerrero v. State, 2003 Tex. App. LEXIS 6443 *8, 2003 WL 21815380 *3
(Tex. App. - Waco, July 23, 2003).
36. Negron, 434 F.2d at 390 (internal citations omitted).
37. 383 U.S. 375, 385 (1966).
38. Id. at 384.
39. Negron, 434 F.2d at 390-91.
40. Carrion, 488 F.2d at 15.
41. Kafka, supra note 12, at 51.
42. See Negron, 434 F.2d at 390.
43. See Rule 44.2(a); Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).