### Angela Leticia GUEVARA & Demecio Lopez, Appellants,

v.

### UNITED STATES, Appellee.

### Nos. 11–CF–209, 11–CF–280.

District of Columbia Court of Appeals.

Argued Feb. 28, 2013.

Decided Oct. 10, 2013.

---

Katerina Semyonova, Public Defender Service with whom James Klein and Samia Fam, Public Defender Service were on the brief, for appellant Guevara.

Phillip C. Zane, Washington, DC, for appellant Lopez.

Uma M. Amuluru, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, Elizabeth H. Danello, and Courtney Saleski, Assistant United States Attorneys, were on the brief, for the appellee.

Before GLICKMAN and OBERLY, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

This case presents two separate legal issues, both arising out of the abduction and stabbing of Silvano Lopez on June 5, 2010. Appellants Angela Guevara and Demecio Lopez were indicted on eight charges arising out of that incident. Following an eleven-day jury trial, Demecio Lopez was convicted of conspiracy,[1] kidnapping while armed,[2] aggravated assault while armed,[3] mayhem while armed,[4] assault with a dangerous weapon,[5] and threatening to injure or kidnap Silvano Lopez.[6] Angela Guevara was also convicted, but only of the charge of threatening to injure or kidnap Silvano Lopez.[7] We will consider first Angela Guevara's argument that the trial court violated her Sixth

---

1. D.C.Code § 22–1805 (2001).

2. D.C.Code §§ 22–406, 4502 (2001).

3. D.C.Code §§ 22–404.01, 4502 (2001).

4. D.C.Code §§ 22–406, 4502 (2001).

5. D.C.Code § 22–402 (2001).

6. D.C.Code § 22–1810 (2001).

7. Both Angela Guevara and Demecio Lopez were found not guilty of a charge of threatening Silvano Lopez's brother, Ricardo Lopez.

Amendment right to a unanimous verdict by not giving the jury a special unanimity instruction. She contends that such an instruction was necessary because the government presented evidence of three distinct threats occurring over the course of the abduction, any of which could have served as the basis for her conviction. We will consider second Demecio Lopez's argument that translation issues during the government's case-in-chief so affected the accuracy and clarity of the testimony that he was denied his right to a fair trial. Neither Demecio Lopez nor Angela Guevara preserved their arguments by objecting at trial. Accordingly, because we conclude that the trial court did not commit plain error, either in failing to give a special unanimity instruction or in its handling of the translation issues, we affirm.

## I.

The government's account of the abduction at trial came almost entirely from the testimony of the victim, Silvano Lopez. According to his testimony, the relevant events unfolded as follows:

Silvano Lopez is appellant Demecio Lopez's ex-brother-in-law, and appellant Angela Guevara is Demecio Lopez's wife. Silvano Lopez's ex-wife and Demecio Lopez's sister, Amalia Lopez, now lives in Guatemala with the two children born to her and Silvano Lopez. On June 5, 2010, Demecio Lopez and two of his other siblings, Armando Lopez and Florinda Lopez, confronted Silvano Lopez at a laundromat, demanding that he turn over certain pictures of Amalia Lopez that Florinda Lopez had asked him to bring to the laundromat. Although Silvano Lopez returned some of these pictures, the three siblings thought he had more; they insisted on going back to Silvano Lopez's house to obtain additional pictures. Silvano Lopez's brother, Ricardo Lopez, was at the house. After accompanying Silvano Lopez back to the house, where he surrendered the remaining pictures, Demecio Lopez seized Silvano Lopez and forced him back outside. Demecio Lopez then called Angela Guevara and told her to come to the house with her van. When she arrived, she got out of the van and slapped Silvano Lopez several times. Demecio Lopez and Armando Lopez pushed Silvano Lopez inside the van, and Angela Guevara helped them by pulling on Silvano Lopez's belt. Inside the van, Silvano Lopez encountered a man he did not recognize. This unknown man then pressed a knife to Silvano Lopez's throat, telling him that he was going to die.

The kidnappers then drove Silvano Lopez around for what was apparently less than an hour, searching for a "street where there were no people around." At some point during this drive, Silvano Lopez received a call from his brother, Ricardo Lopez, on his cell phone. Noticing the incoming call, the unknown man warned Silvano Lopez that he would cut him if he answered.

Eventually, the kidnappers pulled the van over in a wooded area, where the unknown man ordered Silvano out of the vehicle. Then, with Demecio Lopez and Angela Guevara restraining Silvano Lopez's arms, Armando Lopez and the unknown man stabbed Silvano Lopez multiple times in the side and shoulder. During this time, Angela Guevara was slapping Silvano Lopez with one hand while holding him with the other. The assailants then carried the wounded Silvano Lopez back into the van. They drove for some additional time, searching for a place to dump their victim. Eventually, they deposited Silvano Lopez along the road in a different wooded area, somewhere near Catholic University.

After tossing Silvano Lopez out near the curb, Demecio Lopez commanded him not to tell anyone what they had done. He instructed Silvano Lopez to tell the police that "a couple of black guys" had stabbed him. He warned that, if Silvano Lopez identified him and the other assailants to the police, he would find him in the hospital and murder him.[8]

Angela Guevara and Demecio Lopez were both brought to trial on eight separate counts arising out of the abduction and stabbing. During its case-in-chief, the government presented the testimony of three witnesses who did not speak English, including Silvano Lopez. Moreover, while Silvano Lopez gave his testimony in Spanish, he is not a native Spanish speaker—his native language is Q'eqchi'.[9]

Given the difficulties such linguistic problems were likely to cause, the trial court took precautionary steps to ensure an accurate translation. First, it made sure that there were always at least two interpreters present. Second, it asked Spanish-speaking jurors to alert the court to any perceived translation errors. Third, it received assurances from Demecio Lopez's trial counsel, Jose Molina, Esquire—himself a Spanish speaker—that he would monitor the interpretation and object if Silvano Lopez's testimony was translated improperly. While Silvano Lopez himself did not speak English, he testified that the kidnappers spoke with each other in English so that he could not understand them.

Despite these precautions, translation issues arose during the initial portion of Silvano Lopez's testimony. At several points, it appeared that Silvano Lopez's answers were not responsive to the questions posed. For example, Silvano Lopez initially testified that Armando Lopez had a large cloth hanging from his back pocket, but when asked what Armando Lopez was wearing on his legs, he answered: "Nothing." Then, when counsel asked Silvano Lopez what Armando Lopez "look[ed]

---

8. Although it is unclear exactly how much time elapsed during the abduction, the testimony at trial indicates that the entire episode lasted roughly forty to forty-five minutes. Silvano Lopez estimated that, after he turned over the pictures to Demecio Lopez and Armando Lopez, ten minutes passed before Angela Guevara arrived with the van. He testified that the stabbing occurred roughly thirty minutes later. He was unable to say how much time passed between the stabbing and the time the assailants dumped him near Catholic University, because he "couldn't stand the pain." Ricardo Lopez also provided a timeline, which roughly (though not exactly) lined up with Silvano Lopez's estimated timeline. He testified that he noticed Silvano Lopez was gone roughly twenty minutes after Silvano Lopez and Demecio Lopez went outside. He then called Silvano Lopez, but there was no answer. Roughly fifteen minutes later, Silvano Lopez called him back. At this time, the abduction had ended; Silvano Lopez indicated that he was injured and needed to go to the hospital.

The government also presented cellphone tower evidence, which showed calls to and from two cells, phones registered in Angela Guevara's name at various locations in Northwest, D.C. The evidence showed calls to and from the first phone between 5:53 p.m. and 6:50 p.m., and calls to and from the second phone between 5:19 p.m. and 8:44 p.m. In closing argument, the government explained that many of those calls were made to prepare for and arrange the abduction of Silvano Lopez. They suggest a slightly different time frame than does Silvano Lopez's testimony; he estimated that he first encountered Armando Lopez and Florinda Lopez at the laundromat at approximately 4:30 p.m. But both Silvano Lopez and Ricardo Lopez made clear that they were not purporting to provide exact times; they were merely estimating. Thus, while the exact time frame is difficult to pin down, it appears from the testimony as a whole that the entire episode lasted roughly forty to forty-five minutes.

9. Q'eqchi' is a Mayan dialect, spoken in Belize and Guatemala.

like," he answered that "[a]t the time, one could smell alcohol on his breath."

These initial problems, it became apparent, were attributable to the interpreters' relative lack of experience. During a break on the first day of trial, the court observed that the government's direct examination was taking longer than expected, and wondered whether the problem lay with Silvano Lopez or the interpreters. In response, attorney Molina said that the interpreters were causing the difficulty. Elaborating, he said that he thought the interpreters' lack of experience was contributing to the delay, and that his "guess" was that the interpreters did not "have an ear for the slang [Silvano Lopez was] using." In response, the court obtained a new set of interpreters. The court also offered the government the opportunity to re-cover matters it went over during the first portion of Silvano Lopez's testimony. Defense counsel did not object to this course of remedial action.

These measures, however, did not fully resolve the translation difficulties, and other issues cropped up over the remainder of Silvano Lopez's testimony. For instance, even the new set of interpreters had problems translating certain words and terms, such as "stab," "blade," and "knife." In each such instance, the court responded by either having the interpreters clarify their translation or conferring with counsel to reach a consensus and instructing the jury about how the matter was being clarified. Moreover, the jurors, in accordance with the court's earlier request, called attention to what they perceived as an additional translation error: they thought they heard Silvano Lopez answer a question with "si,"

whereas the interpreter translated his answer as, "I don't recall." The court reacted by verifying Silvano Lopez's answer with the Office of the Interpreter, which clarified that Silvano Lopez answered "no se," meaning, "I don't know," and instructed the jury about the clarification.

Some translation difficulties continued even after Silvano Lopez's testimony.[10] The interpreters also had to correct each other at several other points. But these corrections were not substantial, and the interpreters were able to work out accurate translations by cooperating with each other, counsel, and the court.

The jury retired for deliberations on October 25. Over the course of three days, it returned guilty verdicts on six of the eight charges against Demecio Lopez, including making threats against Silvano Lopez. It acquitted Angela Guevara on seven of the eight charges, convicting her of only the threats count.

After trial, Angela Guevara filed a motion for judgment of acquittal, arguing that the evidence was insufficient to show she personally made any threats against Silvano Lopez—as had been charged in the indictment. The government countered that the evidence had been sufficient to convict her on an aiding-and-abetting theory. Specifically, it argued that the evidence showed there were three different threats, any of which could have served as the basis for her conviction as an accomplice: the unknown man's two threats and Demecio Lopez's single threat. In response, Angela Guevara argued that, if that was the case, the trial court should

---

**10.** For instance, during Ricardo Lopez's testimony, there was some confusion regarding his description of the shirt Demecio Lopez had been wearing at the time of the abduction. Demecio Lopez's counsel thought he heard Ricardo Lopez say "stripes," while the interpreter translated the answer as "striped with colors." But when the second interpreter confirmed the first, Demecio Lopez's counsel agreed and the court clarified for the jury that it was "stripes with colors."

have given a special unanimity instruction. Although she acknowledged that she had not requested such an instruction at trial, she claimed that she had not done so because she understood that the government had been arguing that there was only a single threat.

The understanding of appellant's counsel was correct. The transcript shows that, while summing up evidence in support of each charge during her closing argument, the prosecutor referred only to the threats made by Demecio Lopez after Silvano Lopez was dumped out of the van near Catholic University. And in rebuttal, she referred only to the statement made after the kidnappers "dumped [Silvano Lopez] out."

In ruling on Angela Guevara's post-trial motion, the trial court ultimately rejected both of her arguments. First, the court rejected her sufficiency-of-the-evidence argument, finding the evidence sufficient to convict her on an aiding-and-abetting theory. Second, in rejecting her special unanimity instruction argument, it concluded that the jury most likely convicted her based on Demecio Lopez's threat.[11] It further reasoned that, in any event, there had been no need for such an instruction because the threats all occurred during a "continuing course of conduct."

## II.

We address Angela Guevara's arguments first. On appeal, she argues that the trial court was required to deliver a special unanimity instruction *sua sponte*, as there was evidence of three separate threats over the course of the abduction. The trial court, she asserts, was required to instruct the jury that it must agree unanimously as to which threat served as the basis for her conviction. She argues that the court's failure to do so was plain error because this court "squarely addressed the issue presented here" in *Williams v. United States*, 981 A.2d 1224 (D.C.2009).

As Angela Guevara concedes, she did not request a special unanimity instruction at trial. Thus, we review only for plain error. *See Washington v. United States*, 760 A.2d 187, 196–99 (D.C.2000) (on plain-error review, defendant was not entitled to unanimity instruction where harassment occurred both before and after brief reconciliation). "Under plain error review, [an] appellant must show that (1) there was an error, (2) the error was plain, and (3) the error affected his substantial rights." *Little v. United States*, 989 A.2d 1096, 1100 (D.C.2010). But even when an appellant establishes each of these things, reversal is not automatic: this court "may exercise [its] discretion to notice the error only if it 'seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting (*Joyce*) *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). In other words, under the plain error standard, "reversal 'is justified only in exceptional circumstances where a miscarriage of justice would otherwise result.'" *Washington, supra*, 760 A.2d at 197 (quoting *Harris v. United States*, 602 A.2d 154, 159 (D.C.1992)).

For two reasons, we are not persuaded that by not giving the jury, *sua sponte*, a special unanimity instruction, the trial court committed plain error. The first reason is that, given the evidence adduced

---

11. In reaching this conclusion, the court apparently thought, mistakenly, that the jury instructions did not refer to the unknown man's threats. But the jury instructions did in fact make a reference to the unknown man's threats, albeit only during the "overt acts" portion of instructions on the conspiracy charges against the appellants.

at trial, it was not plain or obvious that the court was required to give a special unanimity instruction. The second is that the record does not establish that the omission of a special unanimity instruction affected appellant's substantial rights. Thus, even assuming that the court erred by not giving such an instruction, we conclude that its error was not plain.

This court has held that a special unanimity instruction is required when "a single count encompasses two or more factually or legally separate incidents." *Parks v. United States,* 627 A.2d 1, 8 (1993) (quoting *Gray v. United States,* 544 A.2d 1255, 1257 (D.C.1988)); *see also Washington, supra,* 760 A.2d at 197 ("The requirement for a special unanimity instruction arises when the court cannot deduce from the record whether the jury must have agreed upon one particular set of facts." (quoting *Simms v. United States,* 634 A.2d 442, 445 (D.C.1993) (quotation marks omitted))); *Scarborough v. United States,* 522 A.2d 869, 871 (D.C.1987) ("Such an instruction is necessary to prevent the possibility that some jurors might vote to convict based solely on one incident while others vote to convict based solely on the other." (citing *Hawkins v. United States,* 434 A.2d 446, 448–49 (D.C.1981))).[12] But we have held that no such instruction is required "when a single count is charged and the facts show a continuing course of conduct, rather than a succession of clearly detached incidents, . . . absent some factor

that differentiates the facts on legal grounds." *Gray, supra,* 544 A.2d at 1258.

In applying these principles, we have distinguished between "legally separate" incidents and "factually separate" incidents.[13] *Id.* at 1257; *see also Parks, supra,* 627 A.2d at 8. Incidents may be factually separate when they: (1) are separated by intervening events or a span of time; (2) occur at different places; (3) are based on a "fresh impulse"; (4) occur after the defendant reaches a "fork in the road"; or (5) result in the "invasion of a new interest." *Gray, supra,* 544 A.2d at 1257. They may be legally separate when: (1) different defenses apply to different incidents; or (2) the trial court's instructions are ambiguous, confusing, or tend to allow the jury to convict based on separate incidents. *Id.* at 1257–58; *see also Smith v. United States,* 549 A.2d 1119, 1122–23 (D.C.1988) (trial court committed plain error by giving an ambiguous supplemental instruction that allowed the jury to convict the defendant of possession with intent to distribute based on either of two separate factual instances).

Here, we conclude it was not "clear" or "obvious" that a special unanimity instruction was necessary. *See United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). For error to be plain, it must, "at minimum," be "clear" or "obvious" error "under cur-

---

12. In its brief, the government argues that *Scarborough* is at odds with the U.S. Supreme Court's decisions in *Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), and *Richardson v. United States,* 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). This court squarely addressed and rejected this very argument in *Williams, supra,* 981 A.2d at 1228–29, holding that *Scarborough* remains good law. As this panel is bound by all prior decisions of this court, unless reversed en banc, we are not at liberty

to reexamine *Williams's* holding. *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

13. In *Williams, supra,* 981 A.2d at 1230, we questioned whether, after *Schad, supra* note 13, and *Richardson, supra* note 13, incidents that are only legally separate still require a special unanimity instruction. But because we conclude that here the evidence did not plainly show the threats were either factually or legally separate, we need not resolve that question.

rent law." *Johnson, supra,* 520 U.S. at 467, 117 S.Ct. 1544 (quoting *Olano, supra,* 507 U.S. at 734, 113 S.Ct. 1770). And while we agree with Angela Guevara that the evidence at trial showed the utterance of three threats, we disagree that it was "clear" or "obvious" that these threats were factually or legally separate, as this court has defined those concepts. Rather, the trial court could reasonably have viewed the evidence as showing that each threat was part of a "single unbroken chain of events," in which case, we have held, no special unanimity instruction was necessary. *See Simms, supra,* 634 A.2d at 445 (citing *Gray, supra,* 544 A.2d at 1258).

The evidence did show that the kidnappers threatened Silvano three times in the course of the abduction. The first threat occurred after Demecio Lopez forced Silvano Lopez into the van where the unknown man held a knife to his neck, telling him that he was going to die. The second came a short time later after Ricardo Lopez attempted to telephone his brother, Silvano Lopez: the unknown man warned Silvano Lopez that he would cut him if he answered his cell phone. The third occurred when the assailants were dumping Silvano Lopez on the side of the road: Demecio Lopez warned Silvano Lopez that if he told the police who had kidnapped and assaulted him, Demecio Lopez would murder him in the hospital.

It is not obvious, however, that these incidents were factually separate. Indeed, there are several reasons to think that they were not. One is that each threat occurred during Silvano Lopez's abduction, and thus during a single course of criminal conduct. *See Glymph v. United States,* 490 A.2d 1157, 1160–61 (D.C.1985) (several instances of assaultive behavior lasting a little over an hour constituted a single offense because " 'there was no break in the continuity of events' " and each incident occurred within a "continuing course of assaultive conduct" (quoting *Jones v. United States,* 483 A.2d 1149, 1152 (D.C. 1984))); *Gray, supra,* 544 A.2d at 1258 ("A continuing course of conduct may be found even though there has been some spatial or temporal separation between assaultive acts . . . ." (citations omitted)). They were also all communicated in a similar manner and to the same person. *Cf. Williams, supra,* 981 A.2d at 1225 (a special unanimity instruction was required where multiple threats against an ex-girlfriend were delivered through different persons, on different days, and through different modes of communication). And while the record is not entirely clear as to the exact length of Silvano Lopez's abduction, it appears to have occurred within a relatively short time frame (apparently about forty-five minutes; less than an hour).[14] *Compare id.* (requiring special unanimity instruction where separate threats were made over the course of four months), *with Shivers v. United States,* 533 A.2d 258, 261–62 (D.C. 1987) (finding no plain error where two instances of assaultive conduct were separated by a "break of less than half an hour"). Finally, the threats were all made with the same motive, or the same "original intent": to harm Silvano Lopez and intimidate him into silence.[15] *See Gray,*

---

14. See *supra,* note 9.

15. Angela Guevara argues that each instance of threatening conduct was the product of a "fresh impulse" and a different "motive." We do not agree. Each instance occurred during the course of a single abduction, within the span of a single hour, and was made with the same goal in mind: to harm Silvano Lopez and intimidate him into silence. Thus, each threat was in furtherance of the same, original impulse, not the result of a fresh criminal intent. *Cf. Gray, supra,* 544 A.2d at 1259 ("[T]he interruptions between the second and third acts of intercourse did not terminate appellant's original intent to have

*supra*, 544 A.2d at 1258–59 (interruptions between acts of rape did not "terminate appellant's original intent to have and complete sexual intercourse against the will of the complainant").

Nor was it clear that these threats were legally separate. No separate defenses applied to the threats individually; rather, a single defense—misidentification—applied to each. *Cf. Horton v. United States*, 541 A.2d 604, 611 (D.C.1988) (holding that it was plain error not to deliver a special unanimity instruction where the presentation of separate defenses to separate alleged gunshots caused "inherent" confusion). Angela Guevara's only defense at trial was misidentification: she argued that she played no role in any of the offenses charged. She did not argue—nor was there any evidence to suggest—that she was present when some threats were made, but not others. Thus, if the jury rejected her defense as to one of the threats, it necessarily rejected it as to all three threats. Accordingly, her defense theory presented the trial court with no obvious issue regarding legal separateness. *See Gray, supra*, 544 A.2d at 1257 (multiple incidents are legally separate when different defenses apply to each). *Cf. Scarborough, supra*, 522 A.2d at 873 (holding that special unanimity instruction was required where defendant presented "separate defenses to a single count," which

had the effect of subdividing her defense into "two distinct conceptual groupings" (quoting *United States v. Gipson*, 553 F.2d 453, 458 (5th Cir.1977)) (internal quotation marks omitted)).

Angela Guevara's argument to the contrary rests principally on our decision in *Williams, supra*.[16] In that case, the evidence showed that the appellant made a series of threats against a single person, his former girlfriend, but communicated these threats "to different people by different means (in person or over the telephone) at different times and in different locations." 981 A.2d at 1227. He did so over a four-month period, telling four different individuals that he was going to "get" or "kill" his ex-girlfriend. *Id.* at 1225. On appeal, this court observed that each of these threats was "factually separate" from the others, and "constituted a discrete violation of the threats statute." *Id.* at 1227 (quoting *Gray, supra*, 544 A.2d at 1257). Williams had properly preserved his objection to the jury instructions by requesting a special unanimity instruction. *Id.* at 1225. We held that the trial court erred by denying the appellant's request for a special unanimity instruction. *Id.* at 1225. Angela Guevara's reliance on *Williams* is unavailing because that case is factually distinguishable in several important aspects. Moreover, we were not applying a plain error analysis.[17]

and complete sexual intercourse against the will of the complainant.").

**16.** We are not persuaded by Angela Guevara's additional argument that the continuous-course-of-conduct analysis employed in cases like *Gray* and *Hargrove v. United States*, 55 A.3d 852 (D.C.2012), does not apply to the offense of threats. That argument finds no support in our case law. Indeed, *Williams* rejected any such categorical restriction, explaining that "a continuous stream of threats against a single person in a single brief encounter *would* coalesce into a single threats offense rather than constitute separate multi-

ple offenses." *Id.* at 1227 n. 8 (citing *Glymph, supra*, 490 A.2d at 1160–61) (emphasis in original).

**17.** Angela Guevara also relies on our decision in *Peay v. United States*, 924 A.2d 1023 (D.C. 2007). But that decision is inapposite. The trial court in that case actually *gave* a special unanimity instruction. *Id.* at 1026–27. Accordingly, the appellant's complaint was not that the facts compelled the court to give such an instruction (which it did), but that by doing so the court constructively amended the indictment. *Id.* at 1028. Thus, *Peay* presented a different question altogether than the

The present case appears to share more in common with our decision in *Gray*, than with *Williams*. In *Gray*, the appellant was tried and convicted on a single count of rape, although the evidence showed that he committed three distinct acts of sexual penetration, any of which would have been sufficient to sustain his conviction. 544 A.2d at 1255–56. These acts were separated by changes in location, the passage of a few minutes, and a brief interruption by third parties. *Id.* at 1256. At trial, the appellant did not request, and did not receive, a special unanimity instruction. *Id.* at 1256. On appeal, this court held that the trial court did not plainly err by failing to deliver such an instruction because "short spatial and temporal separations were not enough to transform a single course of action into several separate rapes." *Id.* at 1258. Nor did the interruptions "terminate appellant's original intent to have and complete sexual intercourse against the will of the complainant." *Id.* at 1258–59.

As in *Gray*, the three instances of threatening behavior in this case were separated by relatively short periods of time and changes in location. Also as in *Gray*,

the perpetrators maintained the same motivation, or "original intent." Here, Angela Guevara and the other kidnappers intended to conceal their wrongful treatment of Silvano Lopez and intimidate him into silence. *See id.* at 1259. Moreover, as in *Gray*, there was "no significant break" between the three threat incidents: all three occurred in the course of carrying out a single criminal scheme—the abduction. *See id.* at 1258. Finally, as in *Gray*, there is no objective reason to believe the jury actually disagreed as to what threatening behavior served as the basis for Angela Guevara's conviction; any argument to the contrary would be "mere speculation without basis in the affirmative evidence."[18] *See id.* at 1259.

Ultimately, we conclude that it was not obvious that a special unanimity instruction was required. We recognize, on the other hand, that if defendant's counsel had asked for a special unanimity instruction and stated the basis for it, the court might have been obliged to give such an instruction to the jury.[19] In sum, even assuming the court erred by not *sua sponte* delivering a special unanimity instruction, any such error was not plain.

---

case before us; it offers us little or no guidance.

**18.** We cannot assume, as Angela Guevara urges, that the jury's apparent difficulty in reaching a verdict was caused by a split over which threat incident served as the basis for her conviction. There is no affirmative evidence in the record to support such an assumption. True, the jury took three days to return a guilty verdict on the threats count, and did so only after receiving an anti-deadlock instruction. But this delay was not itself a sign that the jury was split over the three threat incidents, or was divided as to which of the three Angela Guevara was responsible for. Where there is nothing to show what gave the jurors pause, "we cannot indulge in speculation about the jury's thought processes, and thus we must disregard appellant's conjectures as to how the jury may have arrived at

its verdict." *Owens v. United States*, 497 A.2d 1086, 1093 (D.C.1985).

**19.** A clarifying jury instruction might have been appropriate if it had been argued to the court, prior to instructing the jury, that because the three threats were separated by time, location, and surrounding circumstances it would be reasonable to view Demecio Lopez's threat as factually distinct from the threats made by the unknown man. However, as we explain below, at the time the jury was instructed and closing arguments were delivered it was not clear even to the parties themselves that there were three factually separate threats. The government's closing argument relating to the charge of threatening Silvano Lopez dealt only with the threat made by Demecio Lopez. Appellants' counsel made no mention of threats in their closing arguments.

Even assuming, however, that Angela Guevara could show that the trial judge committed an obvious error, we would nevertheless affirm her conviction because she has not established any prejudice to her substantial rights. *See Comford v. United States*, 947 A.2d 1181, 1189 (D.C.2008) ("[T]he appellant must demonstrate that the error affected his substantial rights by showing a reasonable probability that it had a prejudicial effect on the outcome of his trial." (citation omitted)). The trial judge, in denying her post-trial motion for judgment of acquittal, observed that the jury had most likely convicted on the threats charge on the basis of Demecio Lopez's threat. It is significant that it apparently was not clear, even to the parties themselves, that there were three separate threats. The issue did not arise until the government, in its response to Angela Guevara's post-trial motion for judgment of acquittal, argued that the evidence showed three separate threats, any one of which was sufficient to sustain her conviction. Only then did Angela Guevara argue that, in that case, the trial court should have given a special unanimity instruction. She explained that she did not ask for such an instruction at trial because she did not understand the government to be arguing that there had been more than one threat.

Appellant's counsel's understanding was quite reasonable, as was the trial judge's basis for denying the post-trial motion, since the record shows that in closing argument the prosecutor had referred only to the threat Demecio Lopez made after Silvano Lopez was dumped near Catholic University.[20] She made no reference to any threats made by the unknown man in the van. Likewise, defense counsel did not mention in her closing argument the threatening remarks made by the unknown man.

Consequently, it is highly unlikely that the jury returned a verdict of guilty based upon any threat that was not even argued to them by counsel. Under these circumstances, Angela Guevara has not shown that the prejudice necessary to establish plain error arose from the fact that the judge did not, *sua sponte*, give a special unanimity instruction to the jury. *See Little, supra*, 989 A.2d at 1100 ("Under plain error review, [an] appellant must show that ... the error affected his substantial rights."); *Gonzalez v. United States*, 697 A.2d 819, 825 (D.C.1997) ("[W]e observe, first of all, that the government's case was 'largely uncontradicted' and, 'if credited by the jury, was compelling.'" (quoting *Redman v. United States*, 616 A.2d 336, 338 (D.C.1992))). For the foregoing reasons, we conclude that Angela Guevara has failed to establish plain error.

### III.

■ We turn next to Demecio Lopez's argument that he is "entitled to a new trial" because "the court interpreters performed so poorly that [he] was deprived of his right to a fair trial and his right to confront the witnesses against him." Although Demecio Lopez himself may not speak English well,[21] he does not base this

---

**20.** In reviewing the charges of threatening Silvano Lopez and Ricardo Lopez, the government argued,

And then lastly there's the threats. You know that Demecio Lopez, you know beyond a reasonable doubt that he told the victim that the same fate would happen to his brother if he got involved. And you know that Demecio Lopez told the victim that they would kill him at the hospital if he told anybody.

**21.** Silvano Lopez testified that his kidnappers, including Demecio Lopez, spoke in English with one another during the abduction so that he could not understand what they were saying.

claim on his own inability to understand the trial testimony. Rather, he argues that "the problem arose ... [in respect to] the jury's ability to understand the Spanish-speaking witnesses." In essence, he argues that the trial court failed to correct various translation problems, and that its failure to do so was not only error, but plain error.

A defendant who does not speak English has a constitutional and statutory right to an interpreter. *Ko v. United States*, 722 A.2d 830, 834–35 (D.C.1998) (citing D.C.Code § 31–2702(a) (1981)); *United States ex rel. Negron v. New York*, 434 F.2d 386, 388 (2d Cir.1970). The defendant may waive this right by failing to raise it in a timely fashion. *Ramirez v. United States*, 877 A.2d 1040, 1044 (D.C. 2005). But if the defendant does raise the issue and "make[s] the court aware of any difficulties with the translator," then the court must take corrective action. *Id.* On appeal, this court will then review the trial court's action for abuse of discretion. *Id.* In this evaluation, we do not employ a "one size fits all" approach; rather, we take into account "the precise factual situation faced by the trial court" and defer to the trial judge's "on the scene advantage." *Id.* at 1044–45 (internal quotation marks omitted).

Here, our review is even more constrained. Because Demecio Lopez raised no objection at trial, we may review the trial court's action only for plain error.[22] And under that standard, we conclude that the court committed no "clear" or "obvious" error in its treatment of the translation issues. *See Olano, supra,* 507 U.S. at 734, 113 S.Ct. 1770. Further, given the court's efforts to remedy the situation there was no prejudicial effect on the trial. *See Gonzalez, supra,* 697 A.2d at 825–26 (holding, on a constitutional challenge to the adequacy of interpretation, that "although the trial court erred by failing to assure the competence of the interpreter at the beginning of trial, ... this error had little or no effect on the trial" (internal citation omitted)).

Indeed, it is unclear how the court could have better handled what was an obviously difficult situation. The court took precautions from the outset to ensure an accurate translation: it always had two translators present during trial, asked Spanish-speaking jurors to call any mistranslations to its attention, and received assurances from Jose Molina, Esquire, Demecio Lopez's trial counsel and a Spanish speaker, that he would monitor the translations of Silvano Lopez's testimony. The court also reacted promptly to issues as they arose during trial. When it encountered problems with the first set of translators, the court consulted with counsel, obtained two new translators, and offered the government a second chance to review matters it covered in Silvano Lopez's initial testimony. And while some issues persisted even after new

---

22. Demecio Lopez disputes that this is the appropriate standard of review. Relying on *Ramirez, supra,* he claims that no formal objection was necessary, because the court was already aware of the various translation issues. But even assuming he is correct as to the awareness of translation problems themselves, that does not explain his failure to object to the court's corrective action. Indeed, Demecio Lopez's counsel affirmatively stated his satisfaction with the court's approach on several occasions. Thus, by not objecting to the trial court's course of action, or even suggesting a different course, Demecio Lopez failed to preserve his objection for appeal. *See Hasty v. United States,* 669 A.2d 127, 134 (D.C.1995) (explaining that this court reviews errors not objected to under the plain-error standard); *(Linwood) Johnson v. United States,* 387 A.2d 1084, 1086 (D.C.1978) (explaining that the reason for requiring contemporaneous objections is to give the trial court an opportunity to correct potential mistakes).

translators were obtained, the court adequately addressed these issues as they arose. For instance, when a juror indicated that he believed one of the interpreters mistranslated one of Silvano Lopez's answers (the juror thought Mr. Lopez said "si"; he in fact said "no se"), the court contacted the translator's office and clarified his answer. Also, when Demecio Lopez's counsel identified what he believed was a mistranslation (he thought Ricardo Lopez, Silvano Lopez's brother, said "colors," not "stripes"), the court immediately conferred with the interpreters and clarified the answer.

In sum, the court assiduously policed the translation issues as they arose, and reacted reasonably to a difficult set of circumstances. Accordingly, we cannot conclude that the trial court plainly erred by taking the corrective measures it did; it made no "obvious or readily apparent" error, and ran afoul of no "clear" guidance from this court. *See Hasty, supra,* 669 A.2d at 134 (quoting *Foreman v. United States,* 633 A.2d 792, 795 (D.C.1993)). Rather, we are satisfied that the court made a reasonable and diligent effort to ensure a fair and accurate translation.

Finding no plain error, we affirm.