**2022 UT App 119**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ADONIS JONATHAN LOPEZ-BETANCO,
Appellant.

Opinion
No. 20190775-CA
Filed October 20, 2022

Third District Court, Salt Lake Department
The Honorable Royal I. Hansen
No. 191900649

Sarah J. Carlquist, Amy V. Powers, and Matthew
Vanek, Attorneys for Appellant

Sean D. Reyes and David A. Simpson,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

HARRIS, Judge:

¶1      Adonis Jonathan Lopez-Betanco and his girlfriend (Karla[1]) had an altercation. Accounts of the altercation differed, but the jury found Karla's account more persuasive and convicted Lopez-Betanco of aggravated assault and domestic violence in the presence of a child. Lopez-Betanco now appeals those convictions, asserting that the trial court erred in failing to take additional action related to a translation issue that arose at trial. We affirm Lopez-Betanco's convictions.

---

1. A pseudonym.

BACKGROUND[2]

¶2      At the time of the events in question, Lopez-Betanco and Karla—both native Spanish speakers with limited ability to speak English—were living together in an apartment along with Karla's three-year-old daughter from a previous relationship. One night, Lopez-Betanco and Karla got into a disagreement that apparently had to do with one of them texting or otherwise communicating with a person of the opposite sex. But they each gave very different accounts of what happened.

¶3      As Karla recounted the events, she was in the couple's shared bedroom with her daughter when she received a short video, on her phone, from her daughter's father. The video included a "romantic song," and when Lopez-Betanco saw the video he "deleted it," which upset Karla. An argument ensued, and Lopez-Betanco took Karla's phone into the bathroom for a few minutes, then returned to the bedroom and "hit [Karla] in the nose with his closed fist" so hard that Karla thought her nose was broken. Karla then expressed a desire to leave the apartment, and asked Lopez-Betanco to give her phone back so that she could call a friend to come pick her up, but he refused and "became very aggressive." Karla testified that Lopez-Betanco proceeded to "beat [her]," and even "kicked [her] in the stomach" hard enough to knock her to the floor. While Karla was on the floor, Lopez-Betanco told her that "he was going to kill [her]," and started "wringing [her] neck" and "strangulating [her] really hard." At first, Karla attempted to fight back, and scratched Lopez-Betanco on the neck, but she eventually found it difficult to breathe and soon she couldn't "see anything anymore." Karla's daughter was present the whole time, and at one point she began to cry and plead with Lopez-Betanco to "let [her mother] go." Eventually,

---

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Rosen*, 2021 UT App 32, n.1, 484 P.3d 1225 (quotation simplified).

Lopez-Betanco released Karla, and she was able to leave the apartment with her daughter.

¶4 Lopez-Betanco testified in his own defense at trial, and he described the events in question quite differently. In his telling, the dispute arose because Karla had been "looking through" his phone while he was in the shower. While doing so, Karla discovered messages from the mother of Lopez-Betanco's daughter, which upset her. Perceiving that Karla was angry, Lopez-Betanco tried to leave the room, but Karla "grabbed [him] by the shirt" and "started attacking" and "slapping" him. In the fracas, Karla "grabbed [Lopez-Betanco's] neck" and scratched it, inflicting a minor injury. To escape Karla's grasp of his shirt, he "took off" the shirt and then "pushed her." Lopez-Betanco stated that, at that point, Karla "grabbed [a] hammer" and "threw it at [him]," but he "dodged it." Eventually, things "calmed down" and Karla left the apartment with her daughter.

¶5 After Karla and her daughter left the apartment, they walked across the street to a nearby laundromat. Karla was upset, crying, and bleeding from her head. She spoke with a woman outside the laundromat and told her: "Call the police, I have been beaten." Two officers arrived at the laundromat shortly thereafter, one of whom (Officer) spoke Spanish[3] and one of whom did not.

¶6 When the officers arrived, they observed that Karla was "in distress." She had a swollen right eye, "some swelling on the bridge of her nose," and dried blood on her forehead. The officers approached Karla and spoke with her; Officer communicated directly with Karla in Spanish and translated the conversation for his colleague, and their discussion (including Officer's English translation of it) was recorded on Officer's bodycam.

---

3. Although the record indicates that Officer spoke Spanish, it does not reveal much about the extent of his language training or ability, or whether he is a native Spanish speaker.

¶7    Karla was initially hesitant to provide the officers with any substantive information, but she did tell them that "her significant other hit [her]," and she eventually disclosed both Lopez-Betanco's name and their shared address. As the conversation went on, Officer felt as though he was able to build a rapport with Karla's daughter, and Karla "was able to open up to [Officer]."

¶8    At one point in the conversation, Officer asked Karla whether Lopez-Betanco had attempted to strangle her. Karla responded in the affirmative, stating that Lopez-Betanco had wrapped both his hands around her neck for as long as five minutes. Officer then photographed what he saw as "a pattern of a hand being wrapped around the neck and applying pressure to it," in addition to some small reddish dots called "petechiae" on Karla's eyes and lips. According to Officer, these were "textbook [signs of] strangulation," and it would have been "difficult to self-inflict them."

¶9    After Karla finished talking to the officers, she went back to the apartment to pick up her things. The officers followed her there, where they found Lopez-Betanco. The officers spoke with Lopez-Betanco; that conversation was also recorded on Officer's bodycam. As was the case at the laundromat, the conversation took place in Spanish, with Officer acting as a translator for his colleague. During the conversation, Lopez-Betanco described the events largely as recounted above. However, he could not account for the bumps on Karla's head and forehead. Nor could he explain the apparent finger marks found on her neck. When asked about those injuries, he stated simply, "I don't know. I couldn't tell you." He later added, "Yeah, she likes to cut herself."

¶10    With regard to the hammer specifically, Lopez-Betanco told the officers, in Spanish, the following: "*luego pues agarró un martillo y me quería dar con el martillo*." Officer translated this sentence for his colleague, telling him that Lopez-Betanco had said, "She grabbed a hammer and was going to swing it at me."

But despite searching for it, the officers were unable to find a hammer in the apartment.

¶11    Lopez-Betanco was ultimately charged with two crimes: (1) aggravated assault, stated in the first instance as a second-degree felony (if the jury found that Karla had lost consciousness while being strangled) but also stated, in the alternative, as a third-degree felony (if the jury did not find that Karla had lost consciousness); and (2) domestic violence in the presence of a child. The case proceeded to a jury trial.

¶12    At trial, Karla, Officer, and Lopez-Betanco testified as outlined above. The only other witnesses to testify were a bystander at the laundromat, who testified about Karla's emotional arrival there, and a forensic nurse (Nurse), who testified about Karla's injuries. According to Nurse, the petechiae found on Karla's eyes and lips were consistent with strangulation. She also testified that the petechiae did not seem consistent with Lopez-Betanco's version of events, in which he simply grabbed Karla and "pushed her away." Nurse noted that, although petechiae can result from other causes—such as childbirth, scuba diving, allergic reaction, or infection—in those cases, the petechiae would be more broadly distributed throughout the body, as opposed to being concentrated in one central location, as was the case with Karla.

¶13    Both Karla and Lopez-Betanco testified in Spanish, with court-certified interpreters translating their testimony for the jury. Officer testified in English, and therefore no interpreter was used to transmit his testimony to the jury. During Officer's testimony, the State played the video from Officer's bodycam, and the jury heard Officer translate Lopez-Betanco's statement about the hammer as follows: "She grabbed a hammer and was going to swing it at me." The prosecutor followed up with a question, asking Officer, "So at this point [Lopez-Betanco] now says that she grabbed a hammer and swung it at him; is that correct?" Officer responded in the affirmative.

¶14    Lopez-Betanco was the last witness to testify at trial. During cross-examination, the prosecutor attempted to cast doubt on the credibility of Lopez-Betanco's account by emphasizing alleged inconsistencies in his version of events, including whether Lopez-Betanco believed Karla had "swung" the hammer at him or had "thrown" it at him. As noted above, the jury had heard Officer—during the bodycam video—state that Lopez-Betanco told him, in their initial conversation at the apartment, that Karla had grabbed a hammer and had "swung" it at him. But during his direct examination, Lopez-Betanco told the jury—through a court-certified interpreter—that Karla had "grabbed [the] hammer" and "threw it at [him]."

¶15    On this topic, the prosecutor engaged in the following colloquy with Lopez-Betanco, with the questions being posed in English and the responses being given in Spanish, all translated for the witness and for the jury by one of the court-certified interpreters:

> Q: Now you also indicated on your direct testimony that [Karla] grabbed a hammer and threw it at you; isn't that correct?
>
> A: Yes.
>
> . . . .
>
> Q: You told the officers that she tried to hit you with the hammer; didn't you?
>
> A: Yes. Yes. Correct.
>
> Q: But here you're saying she threw the hammer at you?

A: Yeah. She threw the hammer at me because she wanted to hit me with the hammer and so she threw it at me.

Q: Okay. But the word you used with the officers wasn't "hit" it was "swing"; isn't that right? That [Karla] swung the hammer at you, was going to swing it at you and then you ran out of the room?

¶16 At this point, the interpreter interrupted the proceedings and stated: "This is the interpreter speaking. I need to consult a term with my colleague." After a brief off-the-record consultation between the interpreters, the prosecutor then continued with his line of questioning:

Q: When you were describing the incident to officers, you said that [Karla] was going to swing it at you and then you ran out of the room; isn't that right?

A: Yes.

Q: So which one is it? Did she swing it at you, did she try to hit you with it, or did she throw it at you?

A: Well, I told the officers that she wanted to get me with the hammer.

. . . .

Q: You told the officers that she swung the hammer at you and then you left the room; isn't that correct?

A: Yes.

¶17    Later, after Lopez-Betanco had finished testifying and both sides had rested, but before closing arguments and final jury instructions, the interpreters approached the court during a break and explained that they did not believe that "swing" was the best translation for the verb that Lopez-Betanco had used in his statement to Officer during the initial interview. One of them explained to the court that "the word 'swing' in Spanish doesn't actually exist in a literal sense and so . . . the interpreter had to use a word that was more descriptive of the action but that was not the word that [Lopez-Betanco] used in Spanish."[4] He stated that this linguistic conundrum had put them "in a bit of a predicament" during the State's cross-examination of Lopez-Betanco "because there was extensive questioning about" the word "swing" and the interpreters "didn't want to interfere on either side of the case for or against any side."

¶18    Defense counsel then asked the court "to notify the jury about" the issue. In response, the court stated, "I don't know that I'm going to ask the jury to do anything other than simply listen to the interpreters and they've done their due diligence." Defense counsel then asked whether "a simple . . . oral instruction from [the court] explaining what the sidebar was about and instructing the jury that there is no actual verbatim translation for the term 'swing' [would] be appropriate." The court replied:

---

4. The record submitted to us does not reveal which "more descriptive" Spanish words the interpreters used when they translated the prosecutor's question for Lopez-Betanco. But, as noted below, Lopez-Betanco makes no allegation that the linguistic work-around the interpreters utilized failed to appropriately convey the meaning of the English word "swing" to Lopez-Betanco; indeed, he does not allege, in connection with this appeal, that the court-appointed interpreters made any translation error at all at any point in these proceedings.

> You know, my sense is that we're probably going to—rather than wading in on this that . . . I can certainly indicate to the jury that the interpreters had a conference, that the conference they discussed translation for terms. And rather than highlight any term or not highlight one that the interpreters met and conferred and by virtue of that made the appropriate translation of the record here. You know, I'd be glad to do that so there's no question that they received that. Okay?

Defense counsel responded, "I think that would be fine, Your Honor."

¶19 A few minutes later, after the jury returned to the courtroom, the court made the following statement:

> During the break there was an issue that came up and I simply wanted to report to the jury so they're fully aware with regard to matters. During . . . the testimony of one of the witnesses here there was a question between the interpreters as to the correct interpretation of the terms they were called upon to interpret and I can report to you that the interpreters advised the Court subsequently that they had met and conferred, talked about the interpretation, and that the interpretation that they made was consistent with their charge to fully and accurately interpret terms and conditions. So just so you are aware of that taking place and that the interpreters handled that pursuant to their charge as interpreters here in the case.

¶20    After deliberation, the jury found Lopez-Betanco guilty of domestic violence in the presence of a child and of third-degree-felony aggravated assault.[5]

ISSUE AND STANDARD OF REVIEW

¶21    Lopez-Betanco now appeals, and asserts that the trial court erred by "refus[ing] to correct [Officer's] noncertified and incorrect translation of [Lopez-Betanco's] statement to police." We review the court's actions for abuse of discretion. *See State v. Humphrey*, 793 P.2d 918, 925 (Utah Ct. App. 1990) ("Trial courts have the discretion to determine whether a curative instruction is required in a particular case."); *see also State v. Trujillo*, 214 P.2d 626, 634–35 (Utah 1950) ("Before the lower court is overruled in [its] use of an interpreter, there should be positive evidence of an abuse of discretion on [its] part."); *Guevara v. United States*, 77 A.3d 412, 424 (D.C. 2013) (stating that, where a party "makes the court aware of any difficulties with the translator, then the court must take corrective action," and that, on appeal, "this court will then review the trial court's action for abuse of discretion" (quotation simplified)).[6]

---

5. By finding Lopez-Betanco guilty only of third-degree-felony aggravated assault, the jury apparently did not find, beyond a reasonable doubt, that he had caused Karla to lose consciousness.

6. The State contends that this issue is not preserved for our review, given that Lopez-Betanco's attorney ultimately indicated that the court's proposed resolution of the issue "would be fine." But because we resolve this case on the merits in the State's favor, we need not further explore the State's preservation arguments. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." (emphasis omitted)).

ANALYSIS

¶22    Rule 604 of the Utah Rules of Evidence requires that court interpreters "be qualified" and that they "give an oath or affirmation to make a true translation." Our supreme court has noted that "[i]t is the function of an interpreter to transmit question and answer between counsel and the witness, [so] that the court and jury may hear and understand what is said." *Trujillo*, 214 P.2d at 635. When a trial court becomes "aware of any difficulties with" the accuracy of a court-appointed interpreter's translation, "then the court must take corrective action." *See Guevara*, 77 A.3d at 424.

¶23    Lopez-Betanco points out that, in this case, difficulties with translation became apparent, and he asserts that the trial court abused its discretion by handling the issue the way it did. In particular, Lopez-Betanco contends that the court's instruction to the jury about the issue did not go far enough, and he asserts that the court should have taken additional steps to "correct or clarify [Officer's] incorrect translation of Lopez-Betanco's police statement," including specifically informing the jury that there is no direct translation in Spanish for the English verb "to swing."

¶24    But under the circumstances presented here, there is no allegation that any court-appointed interpreter made any mistake or error. Lopez-Betanco's assertion is that *Officer's* translation of Lopez-Betanco's statement for his colleague—contained in the bodycam video played for the jury during Officer's testimony—was inaccurate. Indeed, Lopez-Betanco frames the relevant issue as "[w]hether the trial court erred when it refused to correct [Officer's] noncertified and incorrect translation," and he further acknowledges that "the issue is not that the [court-appointed] interpreters themselves made any error." These concessions render Lopez-Betanco's entire argument infirm.

¶25    Certainly, if a court becomes aware that a court-appointed interpreter has incorrectly translated a witness's testimony for the

jury, the court would be under an obligation to take appropriate action to correct the interpreter's error. *See Guevara*, 77 A.3d at 424–25. But where a different witness—one whose testimony is not being transmitted to the jury through a court-appointed interpreter—offers admissible testimony purporting to translate a statement from a foreign language, the veracity of that witness's testimony, including the accuracy of the witness's purported translation, is not ordinarily a matter for a court to weigh in on. *See People v. Munoz-Casteneda*, 300 P.3d 944, 948 (Colo. App. 2012) ("When a fact witness's testimony includes an English translation of his out-of-court conversation with a non-English speaker, his role does not change from fact witness to neutral interpreter for purposes of that testimony."); *see also State v. Roldan*, 855 A.2d 445, 449 (N.H. 2004) (stating that rules applicable to neutral court interpreters retained by the court do not apply to testimony regarding the meaning or accuracy of foreign language evidence). In such instances, the accuracy of the witness's purported translation is simply an evidentiary matter like any other, which the parties are of course free to debate through the usual and customary evidentiary means. *See Munoz-Casteneda*, 300 P.3d at 948 (noting that the credibility of a fact witness, even when purporting to translate a conversation, is "subject to cross-examination and, generally, to impeachment by independent evidence," and stating that "[i]t is these procedures, rather than any type of court certification, that ensure truthful and accurate fact witness testimony").

¶26 Lopez-Betanco undoubtedly had the right to take issue with Officer's translation of the bodycam conversation. He could have cross-examined Officer about his Spanish-language capability, or about his experience translating conversations into English. *See United States v. Villalta*, 662 F.2d 1205, 1206 (5th Cir. 1981) (noting that "the credibility of the witness's testimony as to Spanish conversations" and as "to his ability to understand Spanish" was a matter for "cross-examination"). He could have asked Officer directly about the accuracy of his translation of the bodycam conversation, including examination about whether the

Spanish language includes an adequate analogue for the English verb "to swing."[7] *See State v. Garcia*, 7 A.3d 355, 368 (Conn. 2010) (stating that the issue of whether a fact witness's "translation was accurate" was one that "[d]efense counsel was free to . . . explore . . . on cross-examination"). And, assuming he met witness disclosure requirements, he could have even called witnesses of his own, trained in Spanish, to offer an opinion regarding the accuracy of Officer's translation. But he was not entitled, under these circumstances, to an instruction from the court directing the jury that Officer's translation was inaccurate. *See id.* (stating that "the ultimate determination of . . . whether [a] translation was accurate rested with the jury"); *see also* Utah R. Crim. P. 19(f) (stating that courts "shall not comment on evidence in the case, and if the court refers to any of the evidence, it shall instruct the jury that they are the exclusive judges of all questions of fact").

CONCLUSION

¶27 The trial court did not abuse its discretion by declining Lopez-Betanco's invitation to instruct the jury that Officer's translation of the bodycam conversation was inaccurate. The accuracy of the translation proffered by Officer—who was not a court-appointed interpreter—was an evidentiary matter for cross-examination, witness testimony, and argument, and was not the proper subject of a corrective jury instruction from the court.

¶28 Affirmed.

_____

7. Upon hearing the interpreters describe the linguistic issue to the court immediately after the close of evidence, Lopez-Betanco made no request to re-open the evidence to, for instance, recall Officer or to offer other testimony about the issue. Nor does he now assert that his trial attorneys were ineffective for electing not to make such a request.